Good morning, your honors. May it please the court, Cody Marvin on behalf of plaintiff appellant Elissa Fody. This is a social security disability case in which the ALJ made several errors which require reversal. The first is that the ALJ did not properly evaluate the opinion of Dr. Ramaduri, who is a treating cardiologist, and instead improperly adopted the opinion of Dr. Jilloar, who is a non-examining cardiologist. Can you explain something to me? She's already 56 years old when she applies for benefits, and doesn't that make her an older person, quote-unquote? It does, yes, according to the regulations. I know, I'm not going to take it personally, but I thought that what you had to show was a little less if you fell in this category. It is, but it depends on the circumstances. If a person is capable of going back to work that they used to do, past relevant work, something they've done in the past 15 years, then those lessened standards don't apply. So in this case, the ALJ found at step four that she was capable of returning to work that she had done in the past. She'd been like a receptionist or something? Yeah, she was a receptionist and a loan officer, I believe. And so you think the worst error has to do with Dr. Ramaduri? I do, yes. Dr. Ramaduri opined that she needed to elevate the leg while she was sitting. And the vocational expert testified that if she had to elevate the leg while sitting, she wouldn't be capable of doing those jobs that she did in the past. So if she weren't capable of doing the jobs that she used to do, then it would move to that different standard would apply to her. Ah, okay, okay. So why isn't the question whether she needs to elevate, or I guess he winds up because she can't afford the stents that he thinks she needs, that she just take aspirin and elevate the legs? Is that right? Yes. Both Dr. Ramaduri and another treating source, Dr. Nemeth, who was treating her for other conditions for her chronic kidney disease and for diabetes, he also said that she needed to extend the leg. So yeah, she wasn't able to apparently afford the stents. And there were two issues with the medication. There was one medication apparently she couldn't afford, and she also explained that because of the chronic kidney disease, she wasn't able to take certain blood thinning drugs that would help with that. Right, she can't take the diuretic because of the kidney disease. No, I understand that. Well obviously we have a deferential standard of review here. So we need to find some, I would need to find something to indicate legal error or some kind of failure to deal with the record. So the ALJ's error here, first because Dr. Ramaduri was a treating source, the ALJ is required to explain the weight given to that opinion and is required to give good reasons for that opinion. Now in this case, the ALJ never even explains the weight given to Dr. Ramaduri. She only mentions it when discussing the opinion of Dr. Jillawar. She mentions that Dr. Ramaduri's assessment is inconsistent with Dr. Jillawar's and then moves on and that's it. So she doesn't ever specifically state the weight, and she never applies the regulatory factors which she's supposed to apply in determining what weight to give to any medical source. And an application of those factors shows that Dr. Ramaduri's opinion should be entitled to great weight. He was a treating source. He saw her six times over a period of two years. And he was also volunteering his time. As he explained, she had no money. He stated that he wasn't concerned about the money, he was concerned about her care. And so he was volunteering the time, suggesting that it was a serious condition in his opinion. He was also a specialist. He was a cardiologist and Dr. Jillawar was a gastroenterologist. So what about Dr. Freeman? The ALJ thinks that his report is internally inconsistent. Yes, and the ALJ's reasoning there is a little bit unclear. The ALJ mentions that Dr. Freeman cites to a couple examinations in the record apparently, one where there was, saying there was normal neurological findings, and then says that that's inconsistent with Dr. Freeman's opinion. And that she was also limited in standing and walking. I think Dr. Freeman opined that she'd be able to stand and walk for an hour. There are lots of things that could affect standing and walking other than neurological conditions. She's got peripheral arterial disease, for example, which is not a neurological condition. And Dr. Freeman did rely on other things. He mentioned that she had a significantly antalgic gait and walked slowly. Another curiosity there is that the ALJ also significantly limited her in standing and walking. So it's not clear from the ALJ's explanation why she found that to be such a material inconsistency and why she relied on that to reject Dr. Freeman's assessment. But isn't the ALJ essentially saying that if she has a job where she can just sit someplace all day long, a sedentary job, presumably she can get up every so often, she can get up at lunchtime or for a coffee break, that she's capable of doing that? So yes, she's saying if just limited to sedentary work within the parameters that Dr. Gillow are opined, she would be capable of returning to that past work. The problem, and why I think Dr. Ramaduri's opinion is the most significant error here, comes down to the leg elevation. Because both vocational experts, there were two hearings, both testified that if you have to elevate your leg to hip height, and she said she had to, then she wouldn't be capable of doing any of that work. So is the leg elevation, is there evidence in the record to suggest that that's a progressively greater need for her over the years? To some degree. There's evidence in the record going back to, I think, as early as 2002, showing that she had swelling, that leg elevation was necessary. Right. I mean, swelling, elevation seems a very straightforward thing to do about swelling, actually. And it wasn't just for swelling. She also testified that it helped to relieve the pain. So it wasn't just swelling we're talking about. There is some indication from her testimony that over the prior two years, from the date of the hearing, it had gotten more painful and there had been more swelling. But it appears that the swelling had been there for quite a while. And she testified that she was able to work with it for a while, but that was at a time when she was able to take the anticoagulants. So she did still have her leg elevated, but to a lower level. That's when she's using the foot rest? Correct. So after that, it did progress to a point where she needed to elevate it higher, and then she wasn't capable of doing that past work anymore. Okay. Well, if you want to save a little rebuttal time, you can do that, or if you have more... Ms. Siegel. Having little or nothing to do with the question at hand, is it true that the regulations say that age 55 is advanced old age? No, it's called, I think, advanced age is the term. Not advanced old age. And then it's 60. What's the difference between advanced age and advanced old age? Well, they don't use the term old in the regulations. They use advanced age, and then they use closely approaching retirement age for the period that's right before you would retire, like before 62. What's retirement age in the... I think the youngest you can retire is 62. Is what? 62, but full retirement would be 65 if you're going to get full social security. What about police officers? I don't... Well, I guess that depends if they are in the social security system, because some of the local police officers pay into social security, but some of the state and local rules, they eliminate the need for social security. Even federal officers. Oh, federal officers, yeah. I don't know. And then you have federal judges, which don't have a rule. Don't even go there. I advise you. So here's my problem with Ms. Foti. Looking at her entire record and all of these doctors, including Dr. Ramaduri, but also Dr. Freeman, whose report I don't see is inconsistent, I find it astounding to think that she could perform even sedentary work. She's got these terrible problems with her legs that come from whatever they come from, her obesity or her peripheral arterial disease or her other conditions. And it's hardly rocket science to think that if your legs are all swollen, you might need to elevate them. That's just gravity. And unless we're repealing Sir Isaac Newton, I don't see it. Well, Your Honor, the ALJ was faced with a very complex case with a huge record, and for that reason she sought the aid of a medical expert who was able to look at the entire record as well as listen to the claimant's testimony at the hearing. And Dr. Gilliwar, the medical expert that was testifying at the hearing, considered all of that record evidence and all the medical tests that measured her blood flow in her legs and the clinical findings from her doctors and from the examining physicians that showed no edema for most of the record shows no edema during the period at issue. And where there is edema, it's only a trace amount. And Dr. Gilliwar explained that when someone is obese, it's very likely you'll have non-clinical plus one edema just from the extra weight. It's not really a clinically significant finding to have plus one edema in an obese person. It doesn't become clinically significant until it's three plus edema. She had diabetes, did she not? I think it's unclear whether she was getting treated for diabetes. I'm looking at the report. It doesn't appear that there's any... Past history of diabetes. If she has a condition, it's controlled. She doesn't have any kind of restrictions that are related to it. And her neurological examinations of her lower extremities showed for the most part that she had normal sensory findings. I think she might have had one or two reports where she had one of the... They test various parts of your lower extremities, and at one point she had a light touch sensory loss. But for the most part, it was normal sensory findings. And that would go along with the analysis of whether there was an impact from an impairment on her functioning. And Dr. Gilliwar did a very thorough analysis of why Dr. Ramaduri's restriction for leg elevation was not warranted for Ms. Foti. Ms. Foti didn't have edema, and even during the examination that was done by Dr. Ramaduri where the doctor recommended leg elevation, that doctor found no edema. So as you were saying... But there's pain. I mean, edema is one reason you might, but she's got this... She needs this dent. She's got the calcification in the blood vessels. She has problems walking. She gets this varicose vein bursting in her lower left leg. She's... I don't know. Well, the Doppler test showed that she had normal blood flow and that she didn't have deep vein thrombosis. She had an angiogram also that was normal that Dr. Gilliwar had said that that shows that she has good blood flow in her legs. So the claim that she absolutely needed a stent is, I think, called into question by those normal blood flow examinations and test findings. And that was something that the ALJ considered in deciding whether the claimant needed those restrictions and whether her complaints of pain were credible. The other thing that the ALJ considered in the pain analysis was that her own doctor, Dr. Samara Wira, said that... Samara Wira. That doctor said that when asked whether the claimant was a malingerer, the doctor indicated, yes, somewhat. To some extent, he said, whatever that means. To some extent, right. But it's not a flat-out no, which is what you usually see in response to a question like that on a treating physician's assessment. And also, the doctor indicated that the objective findings didn't really support the level of restriction that she was claiming. So that calls into question whether she really needed all of those restrictions. And the ALJ did give her a very extensively restricted RFC. Her residual functional capacity was limited to a sedentary work with some extensive pastoral limits, no climbing and occasional things like that. Yeah, I take it that's not being challenged here anyway. Right. And that RFC was supported by Dr. Gilloir's testimony as well as an examining physician's clinical findings as well as an opinion from the examining physician, Dr. Carlton. But Dr. Freeman thinks that her history of knee surgeries leaves her effectively incapable of walking. She really can't walk very far. Right. But that doctor also, when asked about her objective medical findings, listed an ability to walk 50 feet without a cane and normal neurological findings including normal strength, normal motor function, and normal sensory responses, and also normal ranges of knee motion. So the claimant had knee surgeries prior to the period that she's claiming she was disabled. They appear to be successful in that she doesn't. But one of them wasn't because she's had three knee surgeries. Unless she has three legs. But at this point she's no longer seeking further treatment from these doctors who treated her knee condition. So she stopped treatment for that, and she does have normal ranges of motion in her knees. Do you have any other questions? Apparently not. Okay. Thank you, Your Honor. All right. Thank you very much. Anything further, Mr. Marvin? Yes, I'd like to add a couple of things quickly. Another reason for the leg elevation was the combination of the chronic kidney disease and the peripheral arterial disease. As we mentioned in the brief, with a combination of those two, even if they're only at mild to moderate levels, there's an extremely high mortality rate if you have both conditions. And both Dr. Nemeth and Dr. Ramaduri appeared to recognize that. Dr. Nemeth mentioned at one point in the record that he recommended testing a renal function as progression of that disease could result in death. And Dr. Ramaduri stated that our goal is to prevent progression of the disease, at least the popliteal disease. So we have to link that somehow, though, to her functional work capacity. We have to link that in particular, I guess, to the need to keep the legs up versus treat both the renal condition and the legs in some other way. Correct. But with Dr. Ramaduri, in the note where he stated that, it was the same note where he recommended the elevation of the leg. What was the disease? He related the elevation to this interpoliteal? Yes, the interpopliteal disease. That's the peripheral arterial disease. And then the other condition was the hypertension, which resulted in the chronic kidney disease. So he seemed to recognize the severity. But he called for medical management of that whatever that word is. Yes. And as far as the commissioner mentioned the normal angiogram, but as you recognize to some degree, Dr. Freeman, who he does have specialized knowledge in this area, he and Dr. Gilloir appeared to interpret the same data differently. And Dr. Freeman does have specialization in this area. That's something the ALJ never really deals with in the decision. She doesn't talk about the differences of their opinions and why, based on the factors. She was picking the opinion of the gastroenterologist over the doctor with specialized knowledge. Are there no other questions? No, I don't think so. So thank you very much. Thanks to both counsel. We'll take the case under advisement.